# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MICAH J. GOURDE,
*Defendant-Appellant.*

No. 03-30262

D.C. No.
CR-02-06067-FDB

OPINION

Appeal from the United States District Court
for the Western District of Washington
Franklin D. Burgess, District Judge, Presiding

Argued and Submitted
June 9, 2004—San Francisco, California
Panel Opinion Filed September 2, 2004

Rehearing En Banc Granted July 14, 2005*

Argued and Submitted En Banc
September 27, 2005—San Francisco, California

En Banc Opinion Filed March 9, 2006

Before: Mary M. Schroeder, Chief Judge, Stephen Reinhardt,
Melvin Brunetti, Diarmuid F. O'Scannlain,
Pamela Ann Rymer, Andrew J. Kleinfeld, Sidney R. Thomas,
M. Margaret McKeown, Ronald M. Gould,
Consuelo M. Callahan, and Carlos T. Bea, Circuit Judges.

*The court voted to rehear this case en banc. *United States v. Gourde*,
382 F.3d 1003 (9th Cir. 2004), *rehearing en banc granted*, 416 F.3d 961
(9th Cir. 2005).

Opinion by Judge McKeown;
Dissent by Judge Reinhardt;
Dissent by Judge Kleinfeld

**COUNSEL**

Colin Fieman, Assistant Federal Public Defender, Tacoma, Washington, for appellant Micah Gourde.

Janet L. Freeman, Assistant United States Attorney, Seattle, Washington, for appellee United States.

---

**OPINION**

McKEOWN, Circuit Judge:

The term "Lolita" conjures up images ranging from the literary depiction of the adolescent seduced by her stepfather in Vladimir Nabokov's novel[1] to erotic displays of young girls and child pornography. This case requires us to consider probable cause to search a computer for child pornography in the context of an Internet website, known as "Lolitagurls.com," that admittedly displayed child pornography.

Micah Gourde appeals from the district court's denial of his motion to suppress more than 100 images of child pornography seized from his home computer. Gourde claims that the affidavit in support of the search lacked sufficient indicia of probable cause because it contained no evidence that Gourde actually downloaded or possessed child pornography. We disagree. Based on the totality of the circumstances, the magistrate judge who issued the warrant made a "practical, common-sense decision" that there was a "fair probability" that child pornography would be found on Gourde's computer. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).[2] The Fourth Amendment requires no more.

---

[1]Vladimir Nabokov, Lolita (1955).

[2]We need not reach the issue of good faith under *United States v. Leon*, 468 U.S. 897 (1984), because we hold there was probable cause to issue a search warrant.

## BACKGROUND

### I.  THE AFFIDAVIT

In May 2002, the FBI requested a warrant to search the residence of Micah Gourde for the purpose of seizing computer equipment and other materials containing evidence that he "probably caused the uploading, downloading and transmission of child pornography over the Internet" in violation of 18 U.S.C. §§ 2252 and 2252A, which criminalize the possession, receipt and transmission of child pornography. The following facts come from Special Agent David Moriguchi's affidavit in support of the search warrant. *See United States v. Anderson*, 453 F.2d 174, 175 (9th Cir. 1971) ("[A]ll data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath.").

In August 2001, an undercover FBI agent discovered a website called "Lolitagurls.com." The first page of the site contained images of nude and partially-dressed girls, some prepubescent, along with this text:

> Lolitagurls.com offers hard to find pics! With weekly updates and high quality pix inside, you cant go wrong if you like young girls! Lolitas..Full size High Quality Pictures inside Join Now - instant access here THIS SITE updated weekly WITH NEW LOLITA PICS This site is in full compliance with United States Code Title 18 Part I Chapter 110 Section 2256.

The first page directed the user to a second page with more images of nude girls, some prepubescent, including three images displaying the genital areas of minors, and a caption reading "Lolitas age 12-17." The second page contained this text:

> Welcome to Lolitagurls. Over one thousand pictures of girls age 12-17! Naked lolita girls with weekly updates! What you will find here at Lolitagurls.com is a complete collection of young girl pics. BONUS: You can get movies/mpegs at our partners site after you join if you wish.

The second page also had testimonials from website members, such as "This lolita site has everything with young girls!" and "I've never seen in my life the pics of so cute pre-teen girls." This page offered the viewer three ways to see other pages on the website: (1) take a free tour of the site, (2) become a new member of the site, or (3) log in as a returning member.

As part of his investigation, the undercover agent joined the website and was a member from August to December 2001. The membership fee was $19.95 per month, deducted automatically from the member's credit card. Lancelot Security handled credit card processing and access control for Lolitagurls.com. Members received unlimited access to the website and were "allowed . . . to download images directly from the website." Browsing the entire website, whose "primary feature was the images section," the undercover agent captured "hundreds of images" that "included adult pornography, child pornography, and child erotica." These images included the lascivious display of the breasts and genitalia of girls under the age of eighteen.

The FBI eventually identified the owner and operator of Lolitagurls.com and, in January 2002, executed a search warrant. Among the seized items was his computer, which contained child pornography images that had been posted to the Lolitagurls.com website. The owner "admitted . . . that 'Lolitagurls.com' was a child pornography website he operated as a source of income."

In response to a follow-up subpoena, Lancelot Security provided the FBI with information on Lolitagurls.com's sub-

scribers. Lancelot's records listed Gourde as a member and provided his home address, date of birth, email address, and the fact that he had been a subscriber from November 2001 until January 2002. Gourde never cancelled his membership —the FBI shut down the site at the end of January, while he was still a member.

The affidavit contained extensive background information on computers and the characteristics of child pornography collectors. One section set out legal and computer terms relevant to understanding how downloading and possessing child pornography would violate 18 U.S.C. § 2252. Citing FBI computer experts, the affidavit explained that if a computer had ever received or downloaded illegal images, the images would remain on the computer for an extended period. That is, even if the user sent the images to "recycle" and then deleted the files in the recycling bin, the files were not actually erased but were kept in the computer's "slack space" until randomly overwritten, making even deleted files retrievable by computer forensic experts. Any evidence of a violation of 18 U.S.C. § 2252 would almost certainly remain on a computer long after the file had been viewed or downloaded and even after it had been deleted.

The affidavit also described the use of computers for child pornography activities. Based on his experience and that of other FBI experts, Moriguchi wrote that "[p]aid subscription websites are a forum through which persons with similar interests can view and download images in relative privacy." He described how collectors and distributors of child pornography use the free email and online storage services of Internet portals such as Yahoo! and Hotmail, among others, to operate anonymously because these websites require little identifying information. Communications through these portals result in both the intentional and unintentional storage of digital information, and a "user's Internet activities generally leave traces or 'footprints' in the web cache. . . ." Drawing on the expertise of the FBI Behavioral Analysis Unit, the affida-

vit listed certain "traits and characteristics . . . generally found to exist and be true in . . . individuals who collect child pornography." According to the affidavit, the majority of collectors are sexually attracted to children, "collect sexually explicit materials" including digital images for their own sexual gratification, also collect child erotica (images that are not themselves child pornography but still fuel their sexual fantasies involving children), "rarely, if ever, dispose of their sexually explicit materials," and "seek out like-minded individuals, either in person or on the Internet."

The affidavit concluded by identifying facts about Gourde that made it fairly probable that he was a child pornography collector and maintained a collection of child pornography and related evidence: (1) Gourde "took steps to affirmatively join" the website; (2) the website "advertised pictures of young girls"; (3) the website offered images of young girls engaged in sexually explicit conduct; (4) Gourde remained a member for over two months, although he could have cancelled at any time; (5) Gourde had access to hundreds of images, including historical postings to the website; and (6) any time Gourde visited the website, he had to have seen images of "naked prepubescent females with a caption that described them as twelve to seventeen-year-old girls."

## II.  PROCEDURAL BACKGROUND

On the strength of Moriguchi's affidavit, the magistrate judge issued a warrant to search Gourde's residence and computers. The FBI searched Gourde's house and seized his computer, which contained over 100 images of child pornography and erotica.

Gourde filed a motion to suppress the images found on his computer. At the suppression hearing, the district court heard testimony from two FBI agents, including Moriguchi. The district court restricted its ruling to "the face of the affidavit," and denied Gourde's motion to suppress. The district court

determined that the recitations in the affidavit supported a fair probability that evidence of a crime would be found on Gourde's computer. The judge applied a "common sense approach" to conclude that evidence of a subscription to even a "mixed" site—one that offered both legal adult pornography and illegal child pornography—provided the necessary "fair probability" to "look further."

Shortly after, Gourde pleaded guilty to one count of possession of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2) and 2256. In the plea agreement, he admitted to having "hundreds" of such images on his computer. Gourde conditioned his guilty plea on his right to appeal the district court's denial of his motion to suppress.

## DISCUSSION

[1] Our starting point is the Fourth Amendment, which prohibits "unreasonable searches and seizures," and its Warrants Clause, which requires that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. The contours of probable cause were laid out by the Supreme Court in its 1983 landmark decision, *Illinois v. Gates*, 462 U.S. 213. In contrast to the more exacting, technical approach to probable cause in cases before *Gates*, *see id.* at 230 n.6, *Gates* itself marked a return to the "totality of the circumstances" test and emphasized that probable cause means "fair probability," not certainty or even a preponderance of the evidence. *Id.* at 246. In short, a magistrate judge is only required to answer the "commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place" before issuing a search warrant. *Id.* at 230.

The Supreme Court also used *Gates* as a vehicle to elaborate on our role as a reviewing court. We are not in a position

to flyspeck the affidavit through de novo review. *Id.* at 236 ("[A]fter-the-fact scrutiny by courts of the sufficiency of the affidavit should not take the form of *de novo* review"). Rather, the magistrate judge's determination "should be paid great deference." *Id.* (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). This deferential approach is the antithesis of a "grudging or negative attitude" toward search warrants and "a hypertechnical rather than a commonsense" analysis. *Ventresca v. United States*, 380 U.S. 102, 108-09 (1965); *accord United States v. Seybold*, 726 F.2d 502, 505 (9th Cir. 1983) (holding that our limited scope to review simply means determining whether the magistrate had a substantial basis for concluding there was a fair probability that evidence would be found).

We conclude that the affidavit contained sufficient facts to support the magistrate judge's finding that there was a "fair probability" that Gourde's computer contained evidence that he violated 18 U.S.C. §§ 2252 or 2252A.[3]

**[2]** Turning first to the website itself, the evidence is unequivocal that Lolitagurls.com was a child pornography site whose primary content was in the form of images. Indeed, the owner admitted that it "was a child pornography website that he operated as a source of income." The owner's confession to the FBI established that Lolitagurls.com actually contained illegal content, the possession, receipt or transfer of which would be a violation of 18 U.S.C. § 2252. Thus, the magistrate judge had no reason to question whether the images

---

[3]In briefing and argument, the parties focused on whether the affidavit supported a finding of probable cause that Gourde violated 18 U.S.C. § 2252(a)(4)(B), knowing possession of child pornography, presumably because Gourde pleaded guilty to this provision. Significantly, the warrant authorized the FBI to look for evidence that Gourde had violated *any part* of §§ 2252 or 2252A. These provisions criminalize not only possession, but they also criminalize knowing shipment of illegal images, § 2252(a)(1), receipt or distribution, § 2252(a)(2), sale, § 2252(a)(3), or attempt or conspiracy to commit any of these acts, § 2252(b)(1).

described constituted child pornography because the owner himself acknowledged he purveyed illegal images. This fact alone renders futile Gourde's piecemeal attempts to chip away at the affidavit by identifying shortcomings in the description of images—i.e., that the FBI failed to describe images meeting the definition of child pornography, that the agent had no basis for determining how old the girls were, and that the website also contained legal content (i.e., adult pornography and child erotica). In the face of the owner's admission that he was operating a child pornography website, the prophylactic disclaimer that "[t]his site is in full compliance with United States Code, Title 18 Part I Chapter 110 Section 2256" is mere window dressing that absolves the owner or users of nothing.

**[3]** The affidavit then moves from one certainty, that child pornography was on the website, to another—that Gourde had access and wanted access to these illegal images. Gourde subscribed to Lolitagurls.com for over two months, from November 2001 to January 2002. As a paying member, Gourde had unlimited access to hundreds of illegal images. He clearly had the means to receive and possess images in violation of 18 U.S.C. § 2252. But more importantly, Gourde's status as a member manifested his intention and desire to obtain illegal images.

Membership is both a small step and a giant leap. To become a member requires what are at first glance little, easy steps. It was easy for Gourde to submit his home address, email address and credit card data, and he consented to have $19.95 deducted from his credit card every month. But these steps, however easy, only could have been intentional and were not insignificant. Gourde could not have become a member by accident or by a mere click of a button.[4] This reality

---

[4]*Cf. United States v. Froman*, 355 F.3d 882, 885 (5th Cir. 2004) (observing that membership in the Candyman eGroup, a forum dedicated to child pornography, was free and as simple as "clicking the subscribe link on the main web page"). In *Froman*, the Fifth Circuit concluded that there was probable cause to believe that members of the eGroup possessed child pornography. *Id.* at 890-91.

is perhaps easier to see by comparing Gourde to other arche-typical visitors to the site. Gourde was not an accidental browser, such as a student who came across the site after "Googling" the term "Lolita" while researching the Internet for a term paper on Nabokov's book. Nor was Gourde some-one who took advantage of the free tour but, after viewing the site, balked at taking the active steps necessary to become a member and gain unlimited access to images of child pornog-raphy. Gourde is different still from a person who actually mustered the money and nerve to become a member but, the next morning, suffered buyer's remorse or a belated fear of prosecution and cancelled his subscription. Instead, Gourde became a member and never looked back—his membership ended because the FBI shut down the site. The affidavit left little doubt that Gourde had paid to obtain unlimited access to images of child pornography knowingly and willingly, and not involuntary, unwittingly, or even passively. With evidence from Lancelot Security, the FBI linked the email user— "gilbert_95@yahoo.com," a known subscriber to Lolitagurls.com— to Gourde and to his home address in Cas-tle Rock, Washington.

**[4]** Having paid for multi-month access to a child pornogra-phy site, Gourde was also stuck with the near certainty that his computer would contain evidence of a crime had he received or downloaded images in violation of § 2252. Thanks to the long memory of computers, any evidence of a crime was almost certainly still on his computer, even if he had tried to delete the images. FBI computer experts, cited in the affidavit, stated that "even if . . . graphic image files[ ] have been deleted . . . these files can easily be restored." In other words, his computer would contain at least the digital footprint of the images. It was unlikely that evidence of a crime would have been stale or missing, as less than four months had elapsed between the closing of the Lolitagur-ls.com website and the execution of the search warrant. *See United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (holding that the nature of the crime involving child pornogra-

phy, as set forth in the affidavit, "provided 'good reason[ ]' to believe the computerized visual depictions downloaded by Lacy would be present in his apartment when the search was conducted ten months later").

**[5]** Given this triad of solid facts—the site had illegal images, Gourde intended to have and wanted access to these images, and these images were almost certainly retrievable from his computer if he had ever received or downloaded them—the only inference the magistrate judge needed to make to find probable cause was that there was a "fair probability" Gourde had, in fact, received or downloaded images. *Gates* supports the principle that a probable cause determination may be based in part on reasonable inferences. *See* 462 U.S. at 240 (noting that a magistrate judge may "draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant").

**[6]** Here, the reasonable inference that Gourde had received or downloaded images easily meets the "fair probability" test. It neither strains logic nor defies common sense to conclude, based on the totality of these circumstances, that someone who paid for access for two months to a website that actually purveyed child pornography probably had viewed or downloaded such images onto his computer. *See Gates*, 462 U.S. at 246. Together these facts form the basis of the totality-of-the-circumstances analysis that informs the probable cause determination. Employing the principles of *Gates*—practicality, common sense, a fluid and nontechnical conception of probable cause, and deference to the magistrate's determination—we conclude that the search warrant was supported by probable cause.

Other circuits, facing nearly identical facts, have reached the same result for the same reason. *See United States v. Martin*, 426 F.3d 68, 75 (2d Cir. 2005) ("It is common sense that an individual who joins such a site would more than likely download and possess such material."); *United States v. Fro-*

*man*, 355 F.3d 882, 890-91 (5th Cir. 2002) ("[I]t is common sense that a person who voluntarily joins a group such as Candyman, remains a member of the group for approximately a month without cancelling his subscription, and uses screen names that reflect his interest in child pornography, would download such pornography from the website and have it in his possession.").

The details provided on the use of computers by child pornographers and the collector profile strengthen this inference and help "provide[ ] context" for the "fair probability" that Gourde received or downloaded images. *See United States v. Hay*, 231 F.3d 630, 636 (9th Cir. 2000) (reasoning that the collector profile "form[ed] the basis upon which the magistrate judge could plausibly conclude that those files were still on the premises"). The FBI agent concluded that Gourde fit the collector profile because he joined a paid subscription website dedicated to child pornography, where "persons with similar interests can view and download images in relative privacy." Most collectors "are persons who have a sexual attraction to children," and Gourde's membership was a manifestation of that attraction. Collectors act like "pack rats" because they have difficulty obtaining images of child pornography. As such, they are inclined to download and keep such images for a long period of time, and they "rarely, if ever, dispose of their sexually explicit materials." This profile tracks the collector profiles that supported a finding of probable cause in other cases in this circuit and others. *See, e.g., Lacy*, 119 F.3d at 746 ("[T]he affiant explained that collectors and distributors of child pornography value their sexually explicit materials highly, 'rarely if ever' dispose of such material, and store it 'for long periods' in a secure place, typically in their homes."); *Martin*, 426 F.3d at 75.

The Second Circuit's recent decision in *Martin* is instructive. *Martin* stemmed from a widespread investigation of several pornographic websites—"Candyman," "girls12-16," and "shangri_la." *Id.* at 70. Like the affidavit here, in addition to

details about the specific website and target of the search, the affidavit in *Martin* "contained an extensive background discussion of the modus operandi of those who use computers for collecting and distributing child pornography, including their reliance on e-groups, e-mail, bulletin boards, file transfers, and online storage." *Id.* at 75. The affidavit also spelled out "the characteristics and proclivities of child-pornography collectors, specifically how they tend to collect such material, store it, and rarely destroy or discard it." *Id.* The Second Circuit, in line with other circuits, had no difficulty concluding that such an affidavit rose to the level of "fair probability" and established probable cause. *Id.* at 76; *see also United States v. Riccardi*, 405 F.3d 852, 860-61 (10th Cir. 2005) (holding that affidavit's statement that "possessors of child pornography often obtain and retain images of child pornography on their computers," along with other facts, was "more than enough to support" probable cause); *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002) (holding that affidavit supported probable cause, in part, based on "professional experience that child pornographers generally retain their pornography for extended periods").

Gourde seeks to sidestep the "fair probability" standard and elevate probable cause to a test of near certainty. In the face of the clear teaching of *Gates*, Gourde argues that probable cause was lacking because the government could have determined with certainty whether he had actually downloaded illegal images. According to Gourde, the FBI could have found any records of his downloads from Lolitagurls.com from the owner's computer, which the FBI seized before conducting the search of Gourde's residence. Gourde posits that absent such concrete evidence, the profile data and other facts are insufficient to support a warrant.

Whether the FBI could or would have found such data on the owner's computer is not clear from the record, nor is this inquiry the one demanded by precedent. To be sure, this additional data would have transformed a "fair probability" to a

"near certainty" that Gourde had received or possessed illegal images. Better yet, had the FBI caught him at his computer downloading the images, the certainty would have been 100 percent. *Gates*, however, does not compel the government to provide more facts than necessary to show a "fair probability" that Gourde had committed a crime.[5] Gourde's approach imposes a standard explicitly rejected by *Gates*. He confuses the relaxed standard of "fair probability" with the higher standards imposed at trial. *Gates*, 462 U.S. at 235 ("Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision."). The Supreme Court requires neither a prima facie showing nor an affidavit containing facts that make it "more likely true than false" that Gourde possessed child pornography. *Texas v. Brown*, 460 U.S. 730, 742 (1983).

---

[5]In dissent, Judge Reinhardt cites *Franks v. Delaware*, 438 U.S. 154, 155-56, 171-72 (1978), and claims that the affidavit suffered from a material omission, namely that the government could have searched the owner's computer and determined with certainty whether Gourde had downloaded illegal images. Here, the affidavit candidly described that the FBI had seized the owner's computer, a fact that figured into the totality of the circumstances analysis. Nothing suggests that the government intentionally or recklessly omitted any facts or affirmatively avoided searching the owner's computer. To call the FBI's failure to check the owner's computer "conscious avoidance" is pure speculation. Whether the FBI could have obtained verification of Gourde's downloads through a digital examination of the computer is the wrong question to answer. In any event, the benchmark is not what the FBI "could have" done. An affidavit may support probable cause even if the government fails to obtain potentially dispositive information. *See United States v. Miller*, 753 F.2d 1475, 1481 (9th Cir. 1985) (holding that an affidavit supported probable cause even though "[i]ndependent verification could have been easily accomplished in this case" and the "officers failed to take these simple steps"); *United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir. 1995) ("[T]he magistrate judge erred in focusing his *Franks v. Delaware* analysis on what the FBI could have learned with more investigation . . . ."); *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993) (noting that "failure to investigate fully is not evidence of an affiant's reckless disregard for the truth" and that "probable cause does not require an officer to . . . accumulate overwhelming corroborative evidence.") (internal quotation marks omitted).

Gourde also argues that reversal is dictated by *United States v. Weber*, 923 F.2d 1338 (9th Cir. 1991). *Weber* illustrates why the Supreme Court has emphasized that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.

The circumstances in *Weber*, which did not even involve the Internet, were hardly comparable to Gourde's situation. Two years before the search warrant was sought, Weber was targeted for investigation after failing to pick up a parcel addressed to him that "apparently depict[ed] the sexual exploitation of children." *See Weber*, 923 F.2d at 1340. Nothing came of that incident. *Id.* Then, two years later, the Customs Service sent Weber a fictitious solicitation from which he ordered, sight unseen, four pictures advertised as child pornography. The affidavit recited these details, along with a general description of the proclivities of "pedophiles" and "child pornography collectors," without showing the connection between Weber and these profiles and without addressing the two year lag between the first incident and the new solicitation. *Id.* at 1340-41.

Agents executed the warrant and seized not only the four photographs ordered but a host of other images of child pornography that Weber later moved to suppress. Weber did not challenge the seizure of the four photographs, only the other images. We reversed the denial of the suppression motion because the warrant would "justify virtually any search of the home of a person who has once placed an order for child pornography—even if he never receives the materials ordered." *Id.* at 1344. The affidavit also was deficient because it did not "lay a foundation which shows that the person subject to the search is a member of the class" of collectors. *Id.* at 1345.

*Weber* involved child pornography but otherwise bears little resemblance to Gourde's situation. Gourde's continuous,

affirmative steps to access a child pornography website can hardly be compared to the single controlled buy in *Weber* two years after his initial, and unconsummated, foray into child pornography. Nor is the deficiency in the *Weber* affidavit present here—the Moriguchi affidavit specifically identified the circumstances linking the collector profile to Gourde.

We view *Weber* as distinguished by its facts, and we are not persuaded by Gourde's argument that it dictates the outcome of his case. *Weber* cannot be read to support Gourde's position—that a search warrant for child pornography may issue only if the government provides concrete evidence, without relying on any inferences, that a suspect *actually* receives or possesses images of child pornography—without running afoul of *Gates*.

**[7]** We conclude where the dissents begin. Given the current environment of increasing government surveillance and the long memories of computers, we must not let the nature of the alleged crime, child pornography, skew our analysis or make us "lax" in our duty to guard the privacy protected by the Fourth Amendment. We are acutely aware that the digital universe poses particular challenges with respect to the Fourth Amendment. But the result in this case, which hews to Supreme Court precedent, is hardly a step down the path of laxity and into the arms of Big Brother. The district court did not err in its denial of Gourde's motion to suppress the more than 100 images on his computer containing child pornography.

**AFFIRMED** as to the conviction; **REMANDED** to the three-judge panel to consider Gourde's request for a limited remand under *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc).

REINHARDT, Circuit Judge, dissenting:

In this age of increasing government surveillance, lawful and unlawful, and of the retention of all our deeds and thoughts on computers long after we may believe they have been removed, it is important that courts not grow lax in their duty to protect our right to privacy and that they remain vigilant against efforts to weaken our Fourth Amendment protections. It is easy for courts to lose sight of these objectives when the government seeks to obtain evidence of child pornography or narcotics violations. Here, I believe, our court is making an unfortunate error. Let me be clear — no one is suggesting "fly-specking" this case. What is needed instead is a sensitivity to constitutional principles.

The government purports to apply the "totality of the circumstances" test when assessing whether there was a "fair probability" that Gourde possessed illegal images on his computer at the time the warrant was issued. In reaching its conclusion that a fair probability did exist, the majority ignores a critical circumstance: At the time the government sought the warrant, it possessed direct evidence that established whether Gourde in fact had or had not downloaded illegal images to his computer (and thus had them in his possession), yet the government chose not to avail itself of that information. It offered no excuse for its failure to do so, despite the critical nature of the evidence it possessed. The government's actions might fairly be said, at the least, to have constituted "conscious avoidance."

Had the government not had the critical, indeed dispositive, evidence in its possession, the evidence that is set forth in the affidavit *might* have been sufficient to support a finding of probable cause.[1] However, when the government's failure to examine the critical evidence is considered along with the limited information proffered in the affidavit, it cannot be said

---

[1] I have some doubts about the question but I need not decide it here.

that, all things considered, there was a "fair probability" that evidence that Gourde violated 18 U.S.C. §§ 2252 or 2252A would be found on his computer.[2]

Possessing a computer that would reveal whether the defendant had downloaded child pornography and declining to examine it is similar to possessing pictures of a murder in progress and failing to look at them before seeking an arrest warrant for someone thought to be a suspect. In such circum-

[2]On this basis, Gourde had a valid *Franks* claim, in that material omissions from the affidavit led the magistrate to issue a warrant for which there was no probable cause. *See Franks v. Delaware*, 438 U.S. 154, 156 (1978). Under *Franks*, if a criminal defendant establishes by a preponderance of the evidence that an officer recklessly omitted material information from the affidavit, and if the affidavit considered with the omitted evidence is insufficient to establish probable cause, then the "warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking." *Id*. Here, the affidavit omitted material information which, if considered along with the material in the affidavit, would have required a finding of a lack of probable cause.

The majority argues that it is irrelevant that the government failed to examine the critical evidence it had in its possession, claiming that "the benchmark is not what the FBI 'could have' done. An affidavit may support probable cause even if the government fails to obtain potentially dispositive information." *Ante* at 2373 n.5. The majority misses the point. In the cases the majority relies upon to support its argument, the potentially dispositive evidence was *not in the government's possession* at the time it applied for the search warrant. In that circumstance, the courts held, the government is not required to go beyond the facts in its possession and obtain additional evidence through further investigation. *See United States v. Miller*, 753 F.2d 1475, 1479-81 (9th Cir. 1985); *United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir. 1995); *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993). Here, however, the government *already had acquired the dispositive facts*, but failed to avail itself of them or to mention in the affidavit that, as a result of having seized the computer of the owner and operator of Lolitagurls.com, it possessed the records of what images, if any, had been sent to Gourde through the website. Nothing in the cases cited by the majority even suggests that the government's failure to disclose that it possessed but did not examine dispositive evidence before it sought a warrant is anything other than a material omission relevant to the magistrate's determination of probable cause.

stance, unless probable cause was irrefutably established without the dispositive evidence, an evaluation of the totality of the circumstances, both affirmative and negative, would require a finding of lack of probable cause. The "lack" could be resolved quickly by an examination of the evidence in the government's possession. Until then, however, the evidence would simply be too problematic; given the government's unexplained behavior it would fall short of meeting the "fair probability" test. Certainly, a "common-sense" analysis would tell the magistrate, if he knew of the government's omission, that something was wrong. Had the magistrate been advised of all the relevant facts, I doubt that he would have issued the warrant; rather, I would expect he would have told the government to go away and come back after it had looked at the website owner's computer and determined whether there was indeed probable cause.

The majority improperly brushes aside the importance of the government's ability to determine whether Gourde had downloaded or received illegal images. It argues that it did not need to prove that Gourde definitely downloaded or received illegal images in order to show that there was a "fair probability" that he possessed such images on his computer. *Ante* at 2373. That is certainly true — but it is not the issue in the present case. In concluding that the government's ability to determine Gourde's download history is immaterial to the probable cause analysis, the majority confuses two different types of information: evidence that the government could have obtained but that it did not possess at the time it applied for a warrant, and evidence that the government had in its possession at the time it applied for the warrant but did not utilize — evidence that would have answered the question whether there was probable cause. This case involves the latter type. Although the government certainly need not provide definitive proof that an individual downloaded or otherwise received illegal images on his computer to establish probable cause, when it has critical evidence in its possession but decides to avoid becoming aware of the content, it creates a

"circumstance" which casts substantial doubt on the probability that the individual does in fact possess illegal images.

When this circumstance is properly weighed along with the others relied upon by the majority, it can no longer be said that the record before the magistrate judge showed a "fair probability" that Gourde downloaded or otherwise received illegal images. The record makes three things clear: First, Gourde paid for a membership in a website that contained both legal and illegal images in unknown proportions (i.e., a "mixed" website).[3] Second, the government had the ability to determine — without any significant expenditure of time or effort — from the evidence it possessed whether Gourde had ever downloaded *any* images from Lolitagurls.com and, if so, whether any of those images were illegal.[4] Third, the affidavit that the government offered in support of the warrant provided no evidence that Gourde had ever downloaded any images, legal or illegal, from the website. The "totality of the-[se] circumstances" gives rise to one of two conclusions. At best, the "totality of the circumstances" indicates that the government engaged in "conscious avoidance" and deliberately chose not to avail itself of the information in its possession that would have established whether Gourde downloaded or possessed illegal images before seeking the warrant. At worst, the "totality of the circumstances" suggests that the government did access that information and found that Gourde had

---

[3]Although the majority labels the website a "child pornography site," it was in fact "mixed" — that is, it contained both legal images (such as adult pornography) as well as illegal ones.

[4]The majority argues that "[w]hether the FBI could or would have found such data . . . is not clear from the record." *Ante* at 2372. However, the majority's claim ignores strong evidence to the contrary in the record. During the suppression hearing, Special Agent David Moriguchi, who applied for the warrant to search Gourde's home and computer, testified that *four months* before the FBI sought the Gourde search warrant, the FBI had seized the computer of the owner and operator of Lolitagurls.com, and that the seized computer contained the information about what images, if any, had been sent to Gourde through the website.

not downloaded any illegal images, but sought the warrant anyway.[5] Neither "logic" nor "common sense" — to use the guideposts the majority identifies as central to the "totality-of-the-circumstances analysis," *ante* at 2370 — provides an answer to the government's irregular behavior. In the absence of some explanation of its failure to provide the magistrate with the evidence in its possession, I do not believe that it can properly establish probable cause.

Perhaps if no evidence as to whether an individual had in fact downloaded or otherwise received illegal images was in the government's possession, membership in a "mixed" website alone would be sufficient to establish a "fair probability" that the individual possessed such images on his computer. Perhaps not. That case is not before us. Here, the government admitted that, at the time it applied for the warrant, it possessed evidence that could have determined conclusively whether Gourde had downloaded or received illegal images as a result of his membership in the "mixed" website. Yet, it failed to provide the court with this dispositive evidence. Regrettably, the majority ignores this critical fact. In doing so, it fails to consider the "totality of the circumstances." Accordingly, I respectfully dissent.

---

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent. The careful decision by the panel[1] was correct and should be left alone. There was no probable

---

[5]We must consider the circumstances as they existed at the time the warrant was sought by the government, not what we know to be the circumstances after the search. At the time the warrant was issued, these were the two possible conclusions that could have been drawn from the government's failure to include in the affidavit the information contained in the seized computer.

[1]*United States v. Gourde*, 382 F.3d 1003 (9th Cir. 2004).

cause because there was no evidence that Gourde had downloaded any child pornography.

Is the holding of the majority opinion that if a person has subscribed to a site that has legal and illegal material, that suffices as probable cause for a search warrant? That if a person has paid money to look at material that is illegal to possess, he probably possesses it? If the holding is narrower than these formulations, everyone's computer would be safer were the narrowing restrictions made clear. If it is not, the majority opinion is dangerous to everyone's privacy. In my view, the majority errs in concluding that there was probable cause for a search because its inferences depend on unarticulated assumptions that do not make sense. The majority implicitly assumes that a person who likes something probably possesses it, even if possession is against the law.

The importance of this case is considerable because, for most people, their computers are their most private spaces. People commonly talk about the bedroom as a very private space, yet when they have parties, all the guests — including perfect strangers — are invited to toss their coats on the bed. But if one of those guests is caught exploring the host's computer, that will be his last invitation.

There are just too many secrets on people's computers, most legal, some embarrassing, and some potentially tragic in their implications, for loose liberality in allowing search warrants. Emails and history links may show that someone is ordering medication for a disease being kept secret even from family members. Or they may show that someone's child is being counseled by parents for a serious problem that is none of anyone else's business. Or a married mother of three may be carrying on a steamy email correspondence with an old high school boyfriend. Or an otherwise respectable, middle-aged gentleman may be looking at dirty pictures. Just as a conscientious public official may be hounded out of office because a party guest found a homosexual magazine when she

went to the bathroom at his house, people's lives may be ruined because of legal but embarrassing materials found on their computers. And, in all but the largest metropolitan areas, it really does not matter whether any formal charges ensue — if the police or other visitors find the material, it will be all over town and hinted at in the newspaper within a few days.

Nor are secrets the only problem. Warrants ordinarily direct seizure, not just search, and computers are often shared by family members. Seizure of a shared family computer may, though unrelated to the law enforcement purpose, effectively confiscate a professor's book, a student's almost completed Ph.D. thesis, or a business's accounts payable and receivable. People cannot get their legitimate work done if their computer is at the police station because of someone else's suspected child pornography downloads. Sex with children is so disgusting to most of us that we may be too liberal in allowing searches when the government investigates child pornography cases. The privacy of people's computers is too important to let it be eroded by sexual disgust.

The question an issuing magistrate should ask of a search warrant is fairly stated by the majority: considering the "totality of the circumstances," is there a "fair probability" that what is being looked for will be found at the location to be searched?[2] This is a common sense, practical question that the magistrate is supposed to ask before issuing a search warrant.[3]

The answer has to come from the statute defining the crimes at issue and the search warrant application. Common sense questions for the issuing magistrate to ask are "what are the police looking for?" and "why do they think they will find evidence of it there?" The application for the search warrant says that the FBI wanted to search Gourde's home for "evidence of possession, receipt and transmission of child pornog-

---

[2]*Illinois v. Gates*, 462 U.S. 213, 230 (1983).

[3]*Id.* at 231.

raphy" in violation of 18 U.S.C. §§ 2252 and 2252A. So the "what are you looking for?" question is answered precisely and satisfactorily.

The serious, unavoidable next question that an issuing magistrate is obligated to ask is "why do you think there is a fair probability of finding such evidence on Gourde's computer?" Here is where the affidavit fails to make out the case. It establishes only that a website, "Lolitagurls.com," had criminal child pornography on it — along with much legally permissible material — and that Gourde had paid $19.95 to subscribe to it. That is not enough, as a common sense matter, because: (1) Gourde might have been using the website to look at the legal rather than the illegal material, and (2) even if Gourde subscribed just because he liked to look at illegal child pornography, common sense suggests that he also liked to stay out of jail, so he would look but avoid possessing.

I generally agree with the careful analysis in the panel opinion about the mixed nature of the site.[4] In this dissent, I focus mostly on the additional point that evidence of an attraction to child pornography does not support an inference that a person possesses it. The affidavit sets out ample probable cause to infer, at least if one knows of Vladmir Nabakov's novel, that "Lolitagurls.com" was a purveyor of child pornography: its name, its claim to have over 1,000 "pictures of girls age 12-17," its reference to "naked lolita girls," and the pictures of "nude and partially dressed young girls, some prepubescent" on the free tour pages promoting subscriptions, and the images posted in the subscriber section of which "some depicted the lascivious display of the breast and genitalia of girls under the age of 18."

On the other hand, there were indications that supported the inference that some or most subscribers would want the site for access to legal pornography: the promotional language

---

[4]*Gourde*, 382 F.3d at 1011-12.

said "This site is in full compliance with United States Code Title 18 Part I Chapter 110 Section 2256"; the reference to pictures of "naked lolita girls" was in a different sentence from "girls age 12-17"; the price, $19.95 a month, was not extraordinarily high as one might expect of contraband; much of the material on the site (the affidavit does not say whether it is a small portion, a large portion, or almost all) was what the FBI agent's affidavit said was legal pornography, consisting of "adult pornography . . . and child erotica." Thus a person might well subscribe to the site to look at and download legal material. The subscriber might well think — knowing the proclivity of merchants for puffing their goods and of the ability of models to make themselves look younger than they are — that he would have the pleasure of looking at the sort of pornography that appealed to him without the legal risk of looking at anything that involved violation of federal law.

Nevertheless, for purposes of argument, let us assume that the subscriber would think that the assurance of lawfulness and all the legal material were mere window dressing. Let us further assume that as a matter of common sense, subscription to Lolitagurls.com suffices in the "totality of circumstances" to establish that there is a "fair probability"[5] that a subscriber has a perverted interest in looking at criminal child pornography. Though satisfied from the affidavit that Gourde probably had this perverted sexual desire, an issuing magistrate should still have rejected the warrant because it still did not establish a "fair probability" that evidence of a child pornography crime would be found on Gourde's computer.

The reason he could not be assumed to possess child pornography is that possession of child pornography is a very serious crime and the affidavit did not say he had downloaded any. He could use the site to look at child pornography without downloading it, a reasonable assumption in the absence of evidence that he had downloaded images. Common sense

---

[5] *Gates*, 462 U.S. at 436.

suggests that everyone, pervert or not, has the desire to stay out of jail. The ordinary desire to stay out of jail is a factor that must be considered in the totality of circumstances. It would be irrational to assume that an individual is indifferent between subjecting himself to criminal sanctions and avoiding them, when he can attain his object while avoiding them. To commit the crime for which the warrant sought evidence, one has to do something more than look: he must ship, produce, or at the least knowingly possess. The two child pornography statutes at issue do not say that *viewing* child pornography is a crime. Congress could perhaps make it a crime to pay to view such images, but it did not.

Section 2252 provides penalties for one who "knowingly transports or ships," "knowingly receives," "knowingly reproduces . . . for distribution," "knowingly sells," or "knowingly possesses with intent to sell."[6] Section 2252A provides penal-

---

[6] § 2252. Certain activities relating to material involving the sexual exploitation of minors

(a) Any person who—

(1) knowingly transports or ships in interstate or foreign commerce by any means including by computer or mails, any visual depiction, if—

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

(2) knowingly receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce or through the mails, if—

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

ties for one who "knowingly mails, or transports or ships," "knowingly receives or distributes," "knowingly reproduces . . . for distribution," and so forth.[7] There is nothing in either

(Text continued on page 2388)

(3) either—

(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the Government of the United States, or in the Indian country as defined in section 1151 of this title, knowingly sells or possesses with intent to sell any visual depiction; or

(B) knowingly sells or possesses with intent to sell any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means, including by computer, if—

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(ii) such visual depiction is of such conduct; or

(4) either—

(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the Government of the United States, or in the Indian country as defined in section 1151 of this title, knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction; or

(B) knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if—

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(ii) such visual depiction is of such conduct;

shall be punished as provided in subsection (b) of this section.

[7]§ 2252A. Certain activities relating to material constituting or containing child pornography

(a) Any person who—

(1) knowingly mails, or transports or ships in interstate or foreign commerce by any means, including by computer, any child pornography;

(2) knowingly receives or distributes—

(A) any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or

(B) any material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer;

(3) knowingly—

(A) reproduces any child pornography for distribution through the mails, or in interstate or foreign commerce by any means, including by computer; or

(B) advertises, promotes, presents, distributes, or solicits through the mails, or in interstate or foreign commerce by any means, including by computer, any material or purported material in a manner that reflects the belief, or that is intended to cause another to believe, that the material or purported material is, or contains—

(i) an obscene visual depiction of a minor engaging in sexually explicit conduct; or

(ii) a visual depiction of an actual minor engaging in sexually explicit conduct;

(4) either—

(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151), knowingly sells or possesses with the intent to sell any child pornography; or

(B) knowingly sells or possesses with the intent to sell any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by com-

statute that criminalizes looking. Though the spirit and purpose of the law is doubtless to stamp out the child pornogra-

---

puter, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer;

(5) either—

(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151), knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography; or

(B) knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or

(6) knowingly distributes, offers, sends, or provides to a minor any visual depiction, including any photograph, film, video, picture, or computer generated image or picture, whether made or produced by electronic, mechanical, or other means, where such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct—

(A) that has been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer;

(B) that was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer; or

(C) which distribution, offer, sending, or provision is accomplished using the mails or by transmitting or causing to be transmitted any wire communication in interstate or foreign commerce, including by computer,

for purposes of inducing or persuading a minor to participate in any activity that is illegal.

shall be punished as provided in subsection (b).

phy industry, criminal laws have no penumbras or emanations. There is no principle more essential to liberty, or more deeply imbued in our law, than that what is not prohibited, is permitted. That principle, and due process concerns, are why criminal statutes are strictly construed; that is, "[a] criminal law is not to be read expansively to include what is not plainly embraced within the language of the statute."[8]

About the closest the statutes get to mere looking is the phrase "knowingly receives." Though precedent does not settle the question, it does not square with common sense to treat looking as knowingly receiving. True, electrons have to turn a lot of bits into ones and zeroes on the looker's computer to enable him to look, and he has received the electronic signals that do this. But that is not much different from light waves from a picture stimulating rods and cones on the retina. One would not say that a person who had looked at the Mona Lisa at the Louvre had "received" it, even though the reflected light waves had altered electronic signals to the optic nerve from the retina, and a recollection was stored in the brain. The government tries to make something of the computer browser's cache, but that cannot be the same thing as "receiving" because the cache is an area of memory and disk space available to the browser software, not to the computer user. If the computer user accesses the same page on the internet again before the cache is overwritten, the browser software will display the page from the cache to save download time and web traffic, but the user ordinarily cannot display the picture offline from the cache. To view the picture without accessing the site, the computer user usually has to take the additional affirmative step of downloading and saving it as a JPEG, PDF, or in some other user-accessible form. The concept of "receiving" implies possession. Possession requires dominion

---

[8]*Kordel v. United States*, 335 U.S. 345, 348-49 (1948).

and control, a concept well understood from drug and fire-arms cases.[9]

The affidavit does focus on the tendency of a collector of child pornography to preserve the images collected. That squares with common sense, because collectors, whether of legal or illegal items, are by virtue of being collectors unlikely to throw items in their collections away. The portions of the affidavit speaking to the habits of collectors support the inference that if Gourde had downloaded images he probably still had them, even though his subscription ended when the site was terminated four months before the search.

But was Gourde a collector? The search warrant affidavit has one paragraph stating that there was probable cause to believe Gourde was a collector. All it says is that Gourde joined the website, he "could" have easily downloaded images, he did not cancel his subscription, and he would have to have viewed images of naked prepubescent females with descriptive language saying they were 12 to 17 years old.[10]

---

[9]*See United States v. Carrasco*, 257 F.3d 1045, 1049 (9th Cir. 2001) ("To prove constructive possession, the government must prove a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over the firearms.").

[10]Here is the affidavit paragraph 33 in its entirety:

33. The following facts lead me to believe that MICAH GOURDE is a collector of child pornography, and as such is likely to maintain for long periods of time a collection of child pornography and related evidence:

a. GOURDE took steps to affirmatively join the website 'Lolitagurls.com', which advertises pictures of young girls and offers images of minors engaged in sexually explicit conduct.

b. GOURDE remained a member of this website for over two months, although once he gained access to the website, he could have easily removed himself from the list of subscribers. During this time, he had access to hundreds of images, including histori-

That is not enough for probable cause that Gourde was a collector.

The affidavit does not claim that subscribers to publicly available websites like this tend to be collectors (and were such a claim made the foundation for it would need examination), or that collectors acquire their collections from public websites like Lolitagurls.com as opposed to private emails. The question might be raised, "why wouldn't they?" The answer is that possession was and is a serious crime, while simple viewing is not. The statutes quoted earlier set out penalties ranging from five to forty years with mandatory minimums as high as fifteen years for the various child pornography offenses and offenders denoted in them.[11] These penalties impose a high price on collecting, likely to deter many people even if they might like to collect.

The search warrant affidavit also contains one screaming silence: it does not say that the server showed any downloads to Gourde's computer. The affidavit, signed in May 2001, establishes that the FBI took the Lolitagurls.com smut merchant's computer in January 2001. There was plenty of time in these several months to go through it to determine what addresses downloaded images, yet there is no mention that Gourde's address received any. To an experienced lawyer or judge, for whom silences are loud where information would ordinarily be provided, that is like an absence of skid marks at an accident scene or a personal injury complaint alleging

cal postings to the site, which could easily be downloaded during his period of membership.

   c.   Any time GOURDE would have logged on to this website, he would have had to have viewed images of naked prepubescent females with a caption that described them as twelve to seventeen-year-old girls, yet he did not un-subscribe to this website for at least two months.

[11]*See*, 18 U.S.C. §§ 2252 (b), 2252A (b).

grievous physical injury but no medical expenses or wage loss. The stronger inference from this silence in the affidavit, is not that Gourde did download, but that the FBI looked and found that Gourde's computer did *not* receive downloads.

This negative inference is supported by the testimony at the suppression hearing, where the FBI agent acknowledged that "It's fair to say that a record of the operations of this website, the images it contained, when and if they were sent out, transmitted, emailed, that information could have been traced from the Iowa server." He also conceded that the information available from the server "would include information that would inform the F.B.I. about whether somebody downloaded images from the site, when they downloaded them, or other information indicating exactly what was sent from Iowa." There was nothing in the affidavit establishing that Gourde ever downloaded anything from Lolitagurls.com, and the silence suggested that the FBI had checked the download history and found that he had not.

A careful issuing magistrate would have to ask himself the question, "why should I believe Gourde has such images, that is, that he is a collector?" And the common sense answer would have to be, particularly in the absence of evidence of downloads, "Not unless he is a fool, since he can look without criminal risk, and would likely be deterred from collecting by the heavy sanctions applied to it." Part of the "totality of circumstances" is the legal environment in which the individual lives. Common sense suggests that a lot of people would do a lot of things that they might like to do — going 90 on an empty freeway, paying less taxes than are owed, crossing an intersection on a red light when there is no traffic, downloading pirated music on the internet — were it not for the legal trouble they would generate for themselves by doing them.

Ordinarily the criminal law takes seriously the effectiveness of deterrence. A sentencing court is commanded by Congress to assure that the sentence "afford adequate deterrence

to criminal conduct."**¹²** All of the people are not deterred all of the time, but most people are deterred most of the time. Not everybody is deterred from buying $250,000 cars by the high prices either, but most people are, so it would not be reasonable to assume that a multimillionaire car lover probably has a Ferrari. Applying common sense to the totality of circumstances, the issuing magistrate would have to suppose that while Gourde might well have a perverted sexual interest in little girls, he would also have the normal desire to stay out of prison. He could satisfy both desires by looking but not possessing. If he had a fast internet connection, he could look online about as fast as he could look at images on his hard drive. Considering the legal risk if he downloaded images, it would take something more, such as a statement in the affidavit that the smut purveyor's computer showed that Gourde's computer had received downloads, to establish probable cause that Gourde collected the images. Why would he collect images on his hard drive when, as a subscriber, he could look whenever he wanted without the legal risk? The affidavit provides experienced judgment (though not scientific in the sense that *Daubert*¹³ and *Kumho Tire*¹⁴ require) that collectors horde their collectibles, but no probable cause to suggest that Gourde was a collector.

The cases the majority cites generally have factors in addition to site membership to support an inference of collecting illegal pictures — which is the crime for which the warrant sought evidence — as opposed to non-criminal looking. In those cases, the inferences were based on individualized facts, not mere profiling. In *United States v. Froman*, the defendant not only joined the child pornography e-group "Candyman," but also identified himself with aliases announcing his perverted sexual interest in little girls.¹⁵ The internet group in

---

**¹²**18 U.S.C. § 3553(a)(2)(B).

**¹³***Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**¹⁴***Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

**¹⁵***United States v. Froman*, 355, F.3d 882, 890-91 (5th Cir. 2002).

*United States v. Martin* was determined to be "primarily . . . for effecting illegal activity,"[16] but Lolitagurls.com was, as explained above, more ambiguous. In our own precedent, we used the collector profile when the defendant had a personal website that demonstrated an "extreme interest in young children."[17] Unlike each of these cases, there is no evidence particular to Gourde to suggest that he is a collector of illegal images.[18]

The majority concludes that the affidavit made out probable cause by assuming that anyone who subscribes to an internet site with both legal and illegal material must collect illegal material from the site. This assumption stacks inference upon inference until the conclusion is too weak to support the invasion of privacy entailed by a search warrant. "[W]ith each succeeding inference, the last reached is less and less likely to be true."[19] The privacy of a person with a sexual perversion that might make him a danger to our children seems by itself an unlikely candidate for concern. But the overwhelming importance of the privacy of people's computers makes it essential to assure that — even in this ugly corner of human perversion — probable cause seriously interpreted remain a prerequisite for search warrants.

Therefore, I respectfully dissent.

---

[16]*United States v. Martin*, 426 F.3d 68, 77 (2nd Cir. 2005).

[17]*United States v. Hay*, 231 F.3d 630, 634 (9th Cir. 2000).

[18]*See Ybarra v. Illinois*, 444 U.S. 85, 90 (1979) ("a search . . . must be supported by probable cause particularized . . . to that person").

[19]*United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990).